**ROBERTSON OIL COMPANY, INC., Appellee,**

v.

**PHILLIPS PETROLEUM COMPANY, Appellant.**

No. 91–3717.

United States Court of Appeals, Eighth Circuit.

Submitted June 8, 1993.

Decided Dec. 28, 1993.

Theodore B. Olson of Washington, DC, for appellant.

Julius Glickman, Houston, TX, and James Jeans, Platte City, MO, for appellee.

Before MCMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN and HANSEN, Circuit Judges, en banc.

JOHN R. GIBSON, Circuit Judge, with whom HEANEY, Senior Circuit Judge, MCMILLIAN, FAGG, WOLLMAN, and HANSEN, Circuit Judges, join; and with whom MAGILL, Circuit Judge, joins as to Part I.

Phillips Petroleum Company appeals from a district court[1] order refusing to vacate two punitive damage awards—$4,000,000 for tortious interference with a business relationship and $4,000,000 for fraud—after the remand we ordered in *Robertson Oil Co. v. Phillips Petroleum Co.*, 930 F.2d 1342 (8th Cir.1991). Phillips argues that the district court erred in reviewing the punitive damage awards by applying the Arkansas "shock the conscience" standard because that standard does not constrain the jury's discretion when awarding punitive damages so as to satisfy due process considerations. Phillips also argues that the two $4,000,000 awards are grossly disproportionate, arbitrary, capricious, and fundamentally unfair in violation of due process, duplicative; and an abuse of discretion, and that the jury's deliberations were impermissibly influenced by inflammatory evidence of Phillips' wealth. After a panel of this court affirmed the punitive damage awards, *Robertson Oil Co. v. Phillips Petroleum Co.*, 14 F.3d 360 (8th Cir.1992), we granted Phillips' motion to rehear en banc and vacated the panel opinion. *Robertson Oil Co. v. Phillips Petroleum Co.*, 14 F.3d 360 (8th Cir.1992). We received supplemental briefs from the parties and heard arguments, and we again affirm the punitive damage awards.[2]

The case is before this court for the fourth time, and we need not repeat the underlying substantive facts which are set out in our first two decisions: *Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1369 (8th Cir.1989) (*Robertson I*); and *Robertson Oil Co. v. Phillips Petroleum Co.*, 930 F.2d 1342 (8th Cir.1991) (*Robertson II*). This court denied rehearing en banc in both *Robertson I* and *Robertson II*.

The first trial in this case resulted in verdicts against Phillips for fraud, negligence, and tortious interference with a business relationship;[3] an actual damage award of $750,000; and a punitive damage award of $5,000,000. *Robertson I*, 871 F.2d at 1369. We affirmed the tortious interference verdict, but reversed the negligence and fraud verdicts as inconsistent. *Id.* We upheld the actual damage award because it was based on only one injury, the loss of the Spe–Dee Mart account, and the tortious interference verdict established Phillips' liability for that injury. *Id.* at 1376. We struck the punitive damage award, however, because a jury must consider the defendant's conduct when it determines the amount to award, and the general verdict form in this case made it impossible for us to determine how much of the punitive damage award was based on the conduct the jury associated with each of its findings of liability. *Id.* We said that "[e]ach of these theories ... would support a different amount of punitive damages depending upon the conduct involved." *Id.* Some of the punitive damage award may have been based on the conduct underlying the negligence and fraud theories that were reversed. *Id.* Therefore, the case was remanded for retrial of the negligence and fraud claims and the punitive damage award. *Id.* at 1377.

1. THE HONORABLE MORRIS SHEPPARD ARNOLD was United States District Judge for the Western District of Arkansas and was the trial judge in this case. He was appointed Circuit Judge of the United States Court of Appeals for the Eighth Circuit on June 1, 1992. Neither he nor Chief Judge Richard S. Arnold participated in the en banc proceedings in this case.

2. Judge Magill, joining in Part I of this opinion, concurs in the award of punitive damages for tortious interference with a business relationship only.

3. The jury also found Phillips liable for breaching the duty of good faith and fair dealing, but the district court overturned this finding.

The second trial resulted in a verdict against Phillips on the fraud claim,[4] and punitive damage awards of $4,000,000 for fraud and $4,000,000 for tortious interference. *Robertson II*, 930 F.2d at 1343. Phillips appealed again. *Id.* We rejected various claims of error, but because of the intervening United States Supreme Court decision in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), we remanded with instructions for the district court to consider the propriety of the punitive damage awards under the principles of *Haslip* and Arkansas law. *Robertson II*, 930 F.2d at 1347.

 On remand, the district court first analyzed the punitive damage awards under the Arkansas court's "shock the conscience" standard. This standard allows punitive damage awards to stand unless the amount shocks the conscience of the court or demonstrates that jurors were motivated by passion or prejudice. *O'Neal Ford, Inc. v. Davie*, 299 Ark. 45, 770 S.W.2d 656, 659 (1989). The district court studied the historical development of the "shock the conscience" standard and determined that the standard's "long and distinguished history ... bears testimony to its utility and constitutionality." *Robertson Oil Co. v. Phillips Petroleum Co.*, 779 F.Supp. 994, 996 (W.D.Ark.1991). The court then examined Arkansas cases applying the standard and concluded that the Arkansas Supreme Court had enumerated a number of specific inquiries which gave the standard a definite "shape and texture." *Id.* The district court concluded that the standard was not too subjective and that the review criteria and procedures ensured a "meaningful and adequate review by the trial court" as required by *Haslip*, 499 U.S. at 20, 111 S.Ct. at 1044, and therefore, satisfied due process. 779 F.Supp. at 997. The district court then applied the Arkansas review criteria and allowed the awards to stand. *Id.* at 997–98.

The case is now before us again, and the only issue is the propriety of the district court's review of the punitive damage awards under Arkansas law and *Haslip*.[5]

I.

 Phillips advances a multi-faceted argument that the Arkansas "shock the conscience" standard of review does not adequately constrain the discretion of juries to impose punitive damages so as to satisfy due process. Expanding this general argument, Phillips asserts that "standardless" and virtually unlimited jury discretion to punish and highly deferential judicial review of punitive damage verdicts render the Arkansas system constitutionally defective under *Haslip*. Phillips argues that application of the Arkansas standard of malice has been inconsistent and unpredictable, and that there is no fixed standard for the measurement of punitive damages or legislatively defined range. Phillips further argues that there is no reasonable relationship between the compensatory and punitive damage awards. Phillips then launches into a more specific attack on the "shock the conscience" standard, and asserts that federal courts applying Arkansas law have taken a broad brush approach to this standard. Phillips also argues that the Supreme Court approved the punitive damage system in *Haslip* because Alabama limited jury discretion and had a two layered postverdict review procedure for evaluating the propriety of punitive damages. Finally, Phillips argues that the district court's application of the Arkansas "shock the conscience" standard was constitutionally flawed.

Phillips' broad based arguments fail to recognize the scope and nature of the district court's review of the punitive damage awards and, in truth, fail to recognize the review that

---

4. Robertson retried both the fraud and negligence issues, but elected to submit only the fraud theory to the jury.

5. The dissent would accept a party's motion for rehearing en banc of a decision after a second remand to open up the entire litigation. This we should not do. The dissent's willing acceptance of this opportunity reveals a different view of the principles of the law of the case which a majority

of the judges of this court so firmly endorsed in our order denying rehearing en banc in *Liberty Mutual Insurance Co. v. Elgin Warehouse and Equipment*, 4 F.3d 567, 573 (8th Cir.1993). Indeed, the dissent would take this rehearing of *Robertson III* to vacate *Robertson I*, in which we denied rehearing, and vacate *Robertson II*, in which we denied rehearing, and remand the case for a new trial.

Arkansas courts have made of punitive damage awards.

When the district court analyzed the punitive damage awards, it first considered the Arkansas "shock the conscience" standard and the question of whether jurors were motivated by passion and prejudice. 779 F.Supp. at 995–96. The court engaged in an historical analysis of the "shock the conscience" standard in Arkansas cases, as well as earlier English cases, and then examined the awards under the standard in *Haslip.* *Id.* at 996–98. The district court observed that the Arkansas Supreme Court has given the "shock the conscience" standard a "definite shape and texture" by engaging in a number of specific inquiries. *Id.* at 996. The district court stated:

> For example, the [Arkansas Supreme C]ourt has examined the relationship between the relevant parties, the ratio of the punitive award to the compensatory award, the extent and duration of a defendant's acts, the deliberateness of the defendant's acts in the face of no justification for them, the defendant's motives, the defendant's remorse, if any, the defendant's net worth, and other matters, in order to judge the propriety of a punitive award.[6]

*Id.* at 996–97. Applying these criteria, the district court observed that not one, but two juries had unanimously awarded punitive damages on findings that Phillips had committed two intentional torts, and that the ten-to-one ratio of punitive damages to actual damages did not suggest excessiveness in light of Phillips' net worth. *Id.* at 997. The district court rejected Phillips' assertion that Phillips' net worth triggered passion and prejudice on the part of the jurors, because evidence of net worth had not been allowed until the jury made a finding of liability and fixed the compensatory amount. *Id.* at 998. Finally, the court stated that the nervous and

uncertain behavior of Phillips' witnesses could have caused a reasonable fact finder to believe that they were deliberately evasive and had guilty minds. *Id.*

It is evident that the district court considered not only whether the awards shocked the conscience or resulted from passion and prejudice, but also specifically recognized and discussed other factors that numerous Arkansas courts have considered in reviewing punitive damage awards. *Id.* 779 F.Supp. at 996–97. The district court's failure to discuss all the enumerated considerations does not mean that the other factors were not considered. We are satisfied that the district court's analysis properly recognized that although the Arkansas court's "shock the conscience" and passion and prejudice inquiries are broad, the Arkansas cases recognize far more specific issues in their analyses. The district court dealt with a number of the more specific issues, and properly reviewed the issue of punitive damages in light of the Arkansas standards.

Thus, because the district court engaged in a detailed analysis, Phillips' argument that the "shock the conscience" standard does not satisfy due process considerations simply misses the mark. The district court's inquiry was far more specific than this, as is the standard enunciated and the review conducted by Arkansas courts. In our earlier opinions, *Robertson I,* 871 F.2d at 1375–76, and *Robertson II,* 930 F.2d at 1346–47, we discussed the elements underlying punitive damage awards and referred to *Holmes v. Hollingsworth,* 234 Ark. 347, 352 S.W.2d 96 (1961), and *Ray Dodge, Inc. v. Moore,* 251 Ark. 1036, 479 S.W.2d 518 (1972). *Ray Dodge* is particularly instructive.

In *Ray Dodge,* the Arkansas Supreme Court concluded that ·a punitive· damage award was based on a finding of legal malice

**6.** The district court cited these Arkansas Supreme Court decisions in support of this enumeration: *Walt Bennett Ford, Inc. v. Keck,* 298 Ark. 424, 768 S.W.2d 28 (1989); *First Commercial Bank v. Kremer,* 292 Ark. 82, 728 S.W.2d 172 (1987); *Twin City Bank v. Isaacs,* 283 Ark. 127, 672 S.W.2d 651 (1984); *Pursley v. Price,* 283 Ark. 33, 670 S.W.2d 448 (1984); *Matthews v. Rodgers,* 279· Ark. 328, 651 S.W.2d 453 (1983); *Ray Dodge, Inc. v. Moore,* 251 Ark. 1036, 479 S.W.2d 518 (1972); *Holmes v. Hollingsworth,* 234 Ark. 347, 352 S.W.2d 96 (1961); *Vogler v. O'Neal,* 226 Ark. 1007, 295 S.W.2d 629 (1956); *McGlone v. Stokes,* 193 Ark. 1008, 104 S.W.2d 191 (1937); *St. Louis Southwestern Ry. Co. v. Hagler,* 160 Ark. 543, 254 S.W. 1071 (1923); *Gordon v. McLearn,* 123 Ark. 496, 185 S.W. 803 (1916); and *Pine Bluff & Arkansas River Ry. Co. v. Washington,* 116 Ark. 179, 172 S.W. 872 (1915).

and was not so great as to "shock the conscience" of the court or to indicate passion or prejudice on the part of the jury. 479 S.W.2d at 523. The Arkansas court stated that punitive damages are "the penalty the law fixes for conduct which is malicious, wanton, in violation of a relationship of trust or confidence, or which is done with a deliberate intent to injure another." *Id.* The court emphasized that the punitive damage award must not only "deter similar conduct on the part of the particular tortfeasor," but "must also be sufficient to deter others who might be inclined to engage in such conduct." *Id.* The court observed that although the jury had discretion in fixing the amount of punitive damages, the circumstances in *Ray Dodge* showed the jury had exercised its discretion soundly. The *Ray Dodge* facts indicated that the defendant had committed a deliberate wrong, which, if unpunished, might lead to widespread commercial fraud. *Id.* at 524. The court believed the jury's award was not based on passion and prejudice, but rather evidenced "a legitimate concern for the possible consequences of such a practice" to the general public. *Id.*

The court in *Ray Dodge* then considered particular factors governing the proper amount of punitive damages, including the proportion of punitive to actual damages, the defendant's culpability as shown by the actual damages awarded, the defendant's motives, the degree of calculation involved, and the extent of the defendant's disregard of the rights of others. *Id.* *Ray Dodge* fleshes out the "shock the conscience" standard with considerable detail.

The district court's analysis in this case covered the same ground as *Ray Dodge* and *Holmes.* In light of the district court's detailed analysis, Phillips' arguments against the "shock the conscience" standard have no merit.

Like Phillips, we recognize that in *Haslip* the United States Supreme Court considered the Alabama procedures as laid down in recent Alabama Supreme Court decisions, and determined that the procedures for reviewing punitive damage awards met constitutional standards. 499 U.S. at 20, 111 S.Ct. at 1045. The Alabama court's procedures included re-

quiring the trial court to review the award by considering the culpability of defendant's conduct, the desirability of discouraging others from similar conduct, the impact on the parties involved, and the impact on innocent third parties. *Id.* at 19, 111 S.Ct. at 1044. The Alabama court had provided additional checks, first, by engaging in a comparative analysis, and then, by applying substantive standards—considering whether the award exceeded the reasonable amount that would accomplish society's goals of punishment and deterrence. *Id.* at 20, 111 S.Ct. at 1045. The Alabama court had indicated that many factors could be considered in determining whether an award was excessive or inadequate:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Id.* The United States Supreme Court concluded that these standards imposed a sufficiently definite and meaningful constraint on the discretion of Alabama juries in awarding punitive damages. *Id.* The Supreme Court concluded:

The Alabama Supreme Court's post-verdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages. While punitive damages in Alabama may embrace such factors as the heinousness of the civil wrong, its effect

upon the victim, the likelihood of its recurrence, and the extent of defendant's wrongful gain, the fact finder must be guided by more than the defendant's net worth. Alabama plaintiffs do not enjoy a windfall because they have the good fortune to have a defendant with a deep pocket.

*Id.*

Although the items the district court considered in this case do not match the *Haslip* factors identically, they coincide for the most part, and insofar as the district court did not consider some of the *Haslip* factors, the record reveals that they were inapplicable. We are satisfied that the district court's review complies with the principles laid down in *Haslip.*[7]

Phillips argues that a number of post-*Haslip* decisions in other circuits require reversal of the punitive damage awards in this case. Each of the cases Phillips discusses, however, was decided before the Supreme Court's *TXO Production Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), decision which was released soon after we heard argument in this case.[8] In *TXO,* the Supreme Court affirmed a West Virginia punitive damage award of $10,000,000 even though the actual damages supporting the award were only $19,000. *Id.* at ——, 113 S.Ct. at 2713. The plurality (Chief Justice Rehnquist, Justice Stevens, and Justice Blackmun) again rejected any bright line approach to evaluating punitive damage awards, reiterating that " '[a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus.' " *Id.* at ——, 113 S.Ct. at 2720 (quoting *Haslip,* 499 U.S. at 18, 111 S.Ct. at 1043). The Court looked to the facts of the case, including the amount of money potentially at stake, the defendant's bad faith, the overall scheme involved, and the defendant's wealth,

and held that even though a drastic disparity existed between the actual and punitive damage awards, the punitive damage award was not "so 'grossly excessive' as to be beyond the power of the State to allow." *Id.* —— U.S. at ——, 113 S.Ct. at 2723.

Justice Kennedy concurred in part and in the result, observing that the plurality seemed to rely on a "rational relation between the size of the award and the degree of harm threatened by TXO's conduct." *Id.* at ——, 113 S.Ct. at 2725 (Kennedy, J., concurring). Justice Kennedy wrote separately because he found no indication in the record that the jury had evidence regarding "potential harm" when it determined the amount of the award. *Id.* Suggesting that a "manageable constitutional inquiry focuses not on the amount of money a jury awards ... but on its reasons for doing so," Justice Kennedy considered whether there might be another explanation for the jury's award. *Id.* at ——, 113 S.Ct. at 2725–26. He then decided that the jury was probably motivated by a legitimate concern for punishing and deterring. *Id.* at ——, 113 S.Ct. at 2726. He reasoned that the jury found that TXO had committed an intentional tort and that there was evidence of willful and malicious conduct, prior lawsuits alleging similar misdeeds, and argument for the jury to award a large judgment as punishment in light of TXO's wealth. *Id.* at ——, 113 S.Ct. at 2726.

Justices Scalia and Thomas also concurred in the result because although " 'procedural due process' requires judicial review of punitive damages awards for reasonableness ... there is [no] federal constitutional right to a substantively correct 'reasonableness' determination." *Id.* at ——, 113 S.Ct. at 2727 (Scalia, J., concurring). Thus, the West Virginia courts' act of reviewing the award satisfied due process. *Id.*

---

7. Phillips claims that there is an overlap between the punitive damage awards for fraud and for intentional interference with a business relationship, and thus a dual award. We discuss this issue in Part II.

8. *TXO* makes it unnecessary that we further discuss these post-*Haslip* decisions from the other circuits. See our panel opinion for its views on

*Mattison v. Dallas Carrier Corp.,* 947 F.2d 95 (4th Cir.1991), *Mason v. Texaco, Inc.,* 948 F.2d 1546 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992), *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir. 1991), and *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992).

Here, the district court looked to the facts of the case, including the nature of the wrong, the two jury awards, the behavior of Phillips' witnesses, the ratio of punitive to actual damages, and Phillips' net worth, and determined that the awards did not violate due process. 779 F.Supp. at 997–98. According to Justices Scalia and Thomas' opinion, due process was satisfied by the simple fact that the district court reviewed the award. *See TXO*, —— U.S. at ——, 113 S.Ct. at 2727. The district court's review also satisfies the plurality and Justice Kennedy's approach, because the district court focused on the particular facts of the case and identified the reasons the jury might have awarded such an amount. *See id.* at ——, 113 S.Ct. at 2720–23, 2725–26. In fact, the dissenters (Justices O'Connor, White, and Souter) criticized the trial court's ruling in *TXO* because the trial judge made no findings and did not articulate any reason for concluding that the "amount of damages bore a reasonable or recognizable relationship to actual damages or any other relevant measure." *Id.* at ——, 113 S.Ct. at 2740. The West Virginia trial court's deficiency, however, stands in stark contrast to the district judge's thorough analysis of the award in this case. Here, the district court carefully articulated the reasons for its affirmance. *TXO*, therefore, hurts rather than helps Phillips' position.

Phillips asserts that *Haslip* also dealt with jury instructions and asks us to review the punitive damage instruction given in this case. In *Robertson II*, we held that the instruction given was comparable to that approved in *Haslip*, and that Phillips had waived any defect by failing to offer a more detailed instruction or bring to the court's attention the need for the jury to consider the nature and degree of the wrong—the only *Haslip* factor that was not part of the

instruction. *Robertson II*, 930 F.2d at 1347.[9] Phillips invites us to reconsider its argument in light of another panel's later decision in *Union National Bank v. Mosbacher*, 933 F.2d 1440 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992). We should not use *Mosbacher's* failure to apply stare decisis principles to reach a contrary result on the instruction and record before us in this case. *See also Benny M. Estes & Assocs. v. Time Ins. Co.*, 980 F.2d 1228, 1234–35 (8th Cir.1992) (approving the same Arkansas instruction as that given in this case). We decline the invitation to revisit this issue.[10]

■ Phillips also argues that allowing a jury to consider a defendant's financial worth in determining whether to award punitive damages is constitutionally infirm. Insofar as this issue may be separated from the question of the propriety of the jury instruction, *Haslip* does not prohibit such consideration. Although Alabama juries do not consider financial worth when awarding punitive damages, the plurality in *TXO* recognized that many other states do allow such consideration.[11] —— U.S. at ——, 113 S.Ct. at 2723. Moreover, the plurality, Justice Kennedy, and the dissenters agreed that financial worth is a factor that may properly be considered. The plurality noted that "in *Haslip* we referred to the 'financial position' of the defendant as one factor that could be taken into account in assessing punitive damages." *TXO*, —— U.S. at ——, 113 S.Ct. at 2723. Justice Kennedy also looked to the arguments made by plaintiff's attorney regarding "TXO's vast financial resources" to support his conclusion that the facts supported the jury's award. *Id.* at ——, 113 S.Ct. at 2726. Finally, Justice O'Connor stated that consideration of a defendant's wealth is not unconstitutional, recognizing

---

**9.** The dissent's tour de force on the punitive damage instructions ends with recognition that the issue has been waived. We respectfully point out that the instruction issues discussed by the dissent were not raised by Phillips in its briefs.

**10.** We also observe that Phillips offered its own variation of the Arkansas form instruction, which repeated the standard for awarding punitive damages and allowed the jury to consider its financial condition, just like the instruction giv-

en. This record thus prohibits us from reconsidering the constitutional propriety of the instruction.

**11.** Citing *Wagner v. McDaniels*, 9 Ohio St.3d 184, 459 N.E.2d 561, 564 (1984); *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350, 354, n. 3 (1991); *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex.1988); *Viking Ins. Co. v. Jester*, 310 Ark. 317, 836 S.W.2d 371, 379 (1992).

that wealth has historically been considered relevant in assessing punitive damages, and that *"Haslip* itself suggests that the defendant's wealth is a permissible consideration, although it does so only in the context of *appellate* review." *Id.* —— U.S. at ——, 113 S.Ct. at 2737–38 (citations omitted). *TXO* is a complete answer to Phillips' argument on financial worth.

 Phillips also questions whether malice supports an award of punitive damages and was properly submitted in this case. In *Robertson I,* we recognized that the jury had been required to find that Phillips intentionally pursued a course of conduct for the purpose of causing harm in an instruction based on the standard for malice established by the Arkansas Supreme Court. 871 F.2d at 1375. The jury in the first trial made such a finding with respect to the tortious interference claim. *Id.* at 1372–73, 1376; *Robertson II,* 930 F.2d at 1344–45. The jury in the second trial was instructed that the jury had made this finding in the first trial. 930 F.2d at 1344 n. 1, 1345. The court also instructed the second jury that under the fraud theory Robertson had the burden of proving that Phillips intentionally pursued a course of conduct for the purpose of causing injury or damage.[12] This forthright submission of the issue of malice is a complete answer to Phillips' argument that malice is a flexible issue under Arkansas law.

Although Phillips articulates other reasons in support of its claim that the punitive damage awards are unconstitutional and legally improper, what we have said above adequately disposes of all such arguments.

## II.

Phillips next argues that the two $4,000,000 punitive damage awards are duplicative and, therefore, constitutionally excessive. The basic assumption of Phillips' argument is that, although Robertson premised its claims on two separate liability theories, it suffered but a single "inseparable" injury—the loss of the Spe–Dee Mart account—giving rise to

punitive damages. The arguments now advanced by Phillips are substantially different from and are fatally undercut by the prior positions it has taken in *Robertson I* and *Robertson II.*

## A.

 Arkansas, as well as most jurisdictions, follows the rule that an award of compensatory damages must exist before a jury can award punitive damages. *Lake v. Lake,* 262 Ark. 852, 562 S.W.2d 68, 69 (1978). Phillips argues that there is no compensatory award to support the punitive damages for fraud.

We recognized in *Robertson I* that there was only one basis for actual damages underlying all of the liability theories. 871 F.2d at 1376. We stated: "The district court correctly analyzed that all of the liability theories rested upon only one basis for actual damages, the loss of the Spe–Dee Mart account.... We have no quarrel with this analysis." *Id.* We later explained: "the same injury sustained all theories." *Id.* We affirmed the award of $750,000 in actual damages but reversed the $5,000,000 punitive damage award and instructed the district court that it should inform the jury on retrial as to the relationship between the actual and punitive damage considerations. *Id.*

In the second trial, the district court informed the jury that compensatory damages had been awarded and were not to be questioned. 930 F.2d at 1344. Further, the court told the second jury that an appeal had determined that the second jury should decide whether Phillips had defrauded Robertson and, if so, whether Robertson was entitled to punitive damages for fraud. The court instructed that the jury should then decide the amount, if any, Robertson should receive as punitive damages for the intentional interference with contract found by the first jury. The court specifically told the second jury, both at the beginning of voir dire and again before opening statements were made, that:

**12.** Instruction No. 16 stated: "In order to recover punitive damages from Phillips, Robertson Oil has the burden of proving that Phillips intention-
ally pursued a course of conduct for the purpose of causing injury or damage."

In June of 1986, plaintiff sued defendant claiming to have lost one of its best customers, namely Spe–Dee Mart, because of defendant's wrongful conduct. In October of 1987, a jury found that defendant had intentionally interfered with plaintiff's contract with Spe–Dee Mart and returned a verdict in plaintiff's favor in the amount of $750,000.00. This amount was meant to compensate plaintiff for the damages he suffered on account of the loss of the Spe–Dee Mart account. For purposes of this trial you should not question the $750,000.00 compensatory award at any time.…

After an appeal of this earlier trial to a higher court, it has now been determined that plaintiff is entitled to have a jury decide the amount, if any, of punitive damages to which it is entitled for intentional interference, to decide whether defendant defrauded plaintiff, and, if so, to decide whether plaintiff is entitled to punitive damages for fraud.

For purposes of this trial, you should not question these findings but must accept them as true.

Finally, pursuant to our instructions, the court instructed the second jury that the first jury had found the several elements of intentional interference with contract, including "that Robertson Oil Company was damaged in the amount of $750,000." The court in its instructions continued:

> This amount has already been awarded to Robertson Oil Company for its compensatory damages. You should not, therefore, make any award to compensate Robertson Oil Company for its loss of the Spe–Dee Mart account on either the allegation of fraud or the allegation of intentional interference with contract.

Instruction No. 15.

Thus, the district court made clear to the jury in the second trial that the first jury's award of compensatory damage was the basis for any punitive awards for both intentional interference with contract and fraud.

In the second as well as the third appeal to this court, both of which followed the second trial, Phillips made extended arguments with respect to the propriety of the instructions given concerning the first trial, and the propriety of the separate $4,000,000 punitive damages awards. *See Robertson II,* 930 F.2d at 1344–47. Phillips, however, never argued that there was not an award of compensatory damages underlying the award of punitive damages for fraud. Of greater significance is that after the dissent in *Robertson III* objecting to the punitive damage award for fraud on the ground that there was no supporting award of compensatory damages for fraud, Phillips did not argue the dissent's position in either its motion for rehearing en banc or in its supplemental briefing to the en banc court.

It is clear that the first jury's determination of $750,000 in compensatory damages is now supported by the first jury's finding of intentional interference and the second jury's finding of actionable fraud.

**B.**

 We now turn to Phillips' argument that the two $4,000,000 punitive damage awards are duplicative.

In *Robertson I,* we first stated that "all of the liability theories rested upon only one basis for actual damages." 871 F.2d at 1376. We then looked to Arkansas Supreme Court decisions holding that an assessment of punitive damages involves consideration of: the nature, extent, and enormity of the wrong; the intent of the party committing the wrong; and the general circumstances of the particular transaction involved, including any mitigating circumstances, and the financial and social condition and standing of the parties. *Id.* at 1375–76. We recognized that the amount of actual damages is one indication of the "culpability of the defendant." *Id.* at 1376 (quoting *Ray Dodge,* 479 S.W.2d at 523–24). We concluded:

> The conduct of Phillips relevant to an award of punitive damages necessarily differs according to the various theories of liability on which the jury based its verdict.

· · · · ·

As we have explained above, the conduct of a defendant determines the amount of

punitive damages. The tortious interference with a business relationship, fraud, and good faith and fair dealing theories, all intentional torts which support the punitive damage award, each involve different conduct. Each of these theories therefore would support a different amount of punitive damages, depending upon the conduct involved.

*Id.*

This holding is the law of the case.[13] Further, the holding was the basis for instructions on damages given in the second trial, and is the foundation upon which we must consider Phillips' argument as to whether the two punitive awards were duplicative.

At the second trial, the court instructed the jury that an earlier jury had found that Phillips tortiously interfered with a contractual relationship and authorized the jury to award punitive damages on this theory. The court defined the elements of fraud to the jury, and instructed the jury that it could award punitive damages on the fraud theory. The court submitted special interrogatories to the jury, and the jury awarded $4,000,000 as punitive damages on each of the theories.

Considering the awards under principles of Arkansas law we have recited above, the actual damages are identical under each of the theories submitted to the jury. Similarly, the financial and social condition and the standing of the parties are identical with respect to both punitive damage awards.

On the other hand, the nature, extent, and enormity of the wrong, the intent of the party committing it, and the general circumstances attending the particular transaction involved, differ with respect to each of the two punitive awards. These differences are evidenced by the specific jury instructions on the tortious interference with contract[14] and fraud claims.[15] The enumeration of the elements of the two claims in the instructions made abundantly clear to the jury the differing nature of the wrongs.

With respect to Robertson's claim for punitive damages, the court instructed the jury that it must find that Phillips "intentionally pursued a course of conduct for the purpose of causing injury or damage." The court also instructed that the purpose of punitive damages was "to punish a wrongdoer and to deter others from similar conduct." These aspects of the punitive damage instruction relate directly to the nature, extent, and enormity of the wrong and the intent of the party committing the wrong. It is evident that the jury's deliberations were directed to two different torts and two different types of conduct, each of which supports an award of punitive damages.

There is one further element in the equation. In the first appeal, Phillips argued

13. Seven judges of this court, denying rehearing en banc in *Liberty Mutual Insurance Co.,* 4 F.3d at 567, resoundingly affirmed the importance of the law of the case principle. The dissent's argument that the punitive awards are duplicative proceeds from its rejection of *Robertson I* as incorrectly decided. The dissent thus ignores the clearly expressed views of a majority of the judges of this court. Indeed, even Phillips does not now ask us to revisit the holding in *Robertson I.*

14. The court instructed the jury that the previous jury had found the following elements of the tortious interference with contract claim:

First, that there was a valid contract between Robertson Oil Company and Spe–Dee Mart; second, that Phillips Petroleum knew of that contract; third, that Phillips intentionally interfered with that contract by inducing or causing its termination; fourth, that with respect to intentional interference with contract, Phillips was not acting in its own fair interest based upon reasonable economic and business

considerations, but with an intent to cause injury or damage to Robertson Oil Company.

15. The jury was required to find the following elements in order to return a verdict for Robertson on the fraud claim:

First, that Phillips made false statements of material fact to Robertson Oil; second, that Phillips knew or believed that the statements were false or lacked a sufficient basis of information to make the statement; third, that Phillips intended to induce Robertson Oil to act or to refrain from acting in reliance on the statements; fourth, that Robertson Oil justifiably relied on the statements in acting or refraining from acting; and fifth, that the actions of Phillips were a proximate cause of damages to Robertson Oil.

The fifth element necessarily found by the jury causes us to conclude that the dissent's statement that there has been no valid determination by the second jury that Robertson suffered compensable damages from fraud, dissent at pages 393–94, is plainly incorrect.

against the single punitive damage award returned in the first trial, taking the position that there were in fact two separate injuries. Phillips' reply brief in *Robertson I* argues that there are two bases for punitive damages:

The punitive damages award herein is in the form of a general or "global" verdict. It is impossible to apportion the award among the various theories of liability found by the jury, because none of the liability interrogatories refer to punitive damages, but only to "damages" in general, *and neither of the punitive damages interrogatories are (sic) tied to specific torts.* (emphasis supplied)

Punitive damages are not intended to compensate an injured party, but to punish and deter conduct of the offending party. Therefore, the existence and size of an award of punitive damages depends upon the conduct of the defendant, not upon the loss to the plaintiff. The loss to Robertson Oil reflected in the compensatory damages interrogatory has no bearing on the punitive damages award.

Phillips' argument continues and makes specific the two differing timeframes of the conduct that might support punitive damages:

Phillips' relevant conduct differs according to the various theories of liability affirmatively answered by the jury. The key conduct on the tortious interference count allegedly occurred during the meeting between the Phillips representatives and Spe–Dee Mart. However, Phillips' relevant conduct on the fraud, negligence and bad faith counts occurred prior to that time, i.e., in the period up to the October, 1984 meeting between Phillips and Robertson Oil. Yet the jury was permitted to assess punitive damages on every action of Phillips from May through October, 1984, i.e., on *all* conduct of Phillips which supported *all* of the elements of *all* of the causes of action represented by interrogatories Nos. 2–5.

To accept Phillips' argument that both punitive damage awards spring from but one injury requires that we reach a conclusion totally at odds with that embraced by Phillips in the first appeal, a conclusion which led to our holding that separate elements are to be considered in awarding punitive damages, depending upon the nature of the tort involved. *Robertson I*, 871 F.2d at 1376. Although we affirmed only a single award of actual damages in *Robertson I*, we held that the wrongs giving rise to punitive damages involved different conduct and each would support a different amount of punitive damages. In a sense, as Robertson argues, Phillips got what it asked for in the second trial, namely, separate consideration of the punitive damage issue with respect to each specific tort and a separate award by the jury. Phillips is bound in this litigation by the position it took in the first appeal, and its argument that there are duplicative punitive damage awards is most effectively answered by the arguments it asserted in the first appeal. Under these circumstances, we do not believe that the common factors in the two punitive damage awards—namely the amount of actual damages for the single injury and Phillips' net worth—are sufficient to justify a different conclusion.

The jury instructions and the jurors' answers to the interrogatories show that the jury based its punitive damage awards on two separate patterns of conduct.[16] Phillips also has divided the conduct subject to punitive damages into two distinct timeframes,

---

**16.** This case differs from *Holmberg v. Morrisette,* 800 F.2d 205 (8th Cir.1986), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1953, 95 L.Ed.2d 526 (1987), in which this court held that the defendants had injured Holmberg only once and, accordingly, should be punished only once. *See id.* at 212. Similarly, the case differs from *Super-Turf, Inc. v. Monsanto Company,* 660 F.2d 1275 (8th Cir.1981), in which the duplication was found between a treble damage award under antitrust statutes and a punitive damage award for tortious interference with business. *See id.* at 1283. *Stoner v. Houston,* 265 Ark. 928, 582 S.W.2d 28 (1979) is distinguishable for the same reason. *See* 582 S.W.2d at 30–31. While Minnesota law does not control this case, the decision of the Court of Appeals of Minnesota in *Bradley v. Hubbard Broadcasting, Inc.,* 471 N.W.2d 670 (Minn.Ct.App.1991), is also factually distinguishable. That court concluded that the jury assessed its punitive damage award on the same misconduct which the trial court punished by assessing a civil penalty. *Id.* at 678.

the day of the meeting, and the five-month period leading up to that meeting, a division which is consistent with our discussion in *Robertson I.* 871 F.2d at 1369–71.

Here, although there was a single compensatory injury (the loss of the account), there were two separate wrongful courses of conduct supporting the punitive damage awards involving different timeframes.

The record is silent as to whether Phillips requested a cautionary or limiting instruction to guard against the jury considering overlapping conduct on each of the two punitive damage claims. It should have been evident that by submitting two specific claims for punitive damages on two different theories the potential existed for this to occur. Further, we do not know whether Phillips raised the question of duplication before the district court. Certainly, it was not discussed in the district court order, and such an argument was not pressed in the second appeal of this case. *See Robertson II,* 930 F.2d at 1342.

We conclude that the punitive damage awards are not duplicative. Each of the jury awards was approximately five and one-third times the actual damage award. The two together are approximately eleven times the actual damage award. On the record before us, we do not believe that such an amount is sufficient to shock the judicial conscience or to demonstrate that the jury was motivated by passion and prejudice. As the district court observed, strong issues of credibility arose in the trial of the case. The district court specifically commented that a reasonable factfinder could have thought Phillips'

principal witnesses were deliberately evasive and that they had guilty minds. Under such circumstances, we should not disturb the jury verdict, and we do not believe that *Haslip,* 499 U.S. 1, 111 S.Ct. 1032, or *TXO,* —— U.S. ——, 113 S.Ct. 2711, or due process principles require us to do so.

We affirm the judgment of punitive damages for fraud in the amount of four million dollars, and for intentional interference with contract in the amount of four million dollars.

BEAM, Circuit Judge, dissenting, with whom BOWMAN and LOKEN, Circuit Judges, join, and with whom MAGILL, Circuit Judge, joins as to Parts II C and D.

After considering this case four times, this court now affirms two separate $4,000,000 punitive damage awards arising from a single compensable injury. I dissent.

Without serious contradiction from any party or any judge involved in this case, the single compensable event in this dispute was the purported loss by Robertson of its Spe–Dee Mart account. And, at the first trial in this matter, the co-owner of Spe–Dee Mart testified that within two months after the activities at issue in this litigation, Robertson would have lost the account anyway because of Spe–Dee Mart's acceptance of a direct petroleum jobbership (the same status held by Robertson) offered by Unocal, one of Phillips' competitors. In fact, Spe–Dee Mart had been searching for such an arrangement since 1971. Trial I Transcript, Vol. 2 at 31.[1] So, for a two-month period of lost "branding,"[2] the jury compensated Robertson with

---

1. Indeed, at the second trial, Stanley Greenwood, general manager and co-owner of Spe–Dee Mart Stores testified as follows:

 [Jones (for Phillips):]
 And even if you had been branded Phillips by Butch Robertson, through Butch Robertson by Phillips, if an opportunity came along where you could have gotten a direct contract with a major oil company to become a jobber yourself, you would have done that?
 [Greenwood:]
 I would have accepted the jobbership, yes. Trial II Transcript, Vol. 2 at 194. The evidence establishes that such an opportunity came along in December 1984 which resulted in Spe–Dee Mart becoming a Unocal jobber in January 1985. *Id.* at 182. The meeting at which Phillips pur-

portedly interfered with Robertson's relationship with Spe–Dee Mart occurred in October 1984. *Id.* at 107.

2. Before this litigation began, Spe–Dee Mart, an independent marketer, was already receiving Phillips' products through Robertson. It simply sought to have its retail outlets "branded" through use of Phillips Petroleum Company signs, logos and credit cards. Robertson claims that Phillips refused Robertson's request that all Spe–Dee Mart stations be "branded," causing Spe–Dee Mart to quit doing business with Robertson. However, Spe–Dee Mart continued to receive Phillips' products through Robertson after the events giving rise to litigation and up to the time it commenced its relationship with Unocal. Trial II Transcript, Vol. 2 at 207–08.

a $750,000 actual damages award, an amount affirmed by a panel of this court. *Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368 (8th Cir.1989) (*Robertson I* ). This court now endorses an additional $8,000,000 in punitive damages for Robertson. It is no wonder that the Supreme Court recently voiced its concern "about punitive damages that 'run wild.'" *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991).

## I. PROCEDURE

Before addressing the substantive issues, I consider two procedural matters. They present separate but interrelated concerns.

This court states that "the case is now before us again [en banc], and the only issue is the propriety of the district court's review of the punitive damage awards under Arkansas law and *Haslip*." *Supra* at 376. I disagree. The court also mentions that rehearing en banc was denied in both *Robertson I* and *II*. *Supra* at 375. Since we now consider the case en banc, this latter point is immaterial. However, both of these statements merit discussion.

### A. Matters Before the Court

The court apparently makes its "only issue" statement in reliance on decisions made by panels of this court in earlier appeals which it labels *Robertson I, Robertson II* and *Robertson III*.[3] *Supra* at 375. (I will also use these designations.) This approach is based upon a "law of the case" argument. *See supra* at 382–83 and n. 13. That is, all issues that were decided in *Robertson I* and *Robertson II* are not now susceptible to consideration by the court en banc since we rejected en banc review after *Robertson I* and *Robertson II*.

In the usual course of events, when a suggestion for rehearing en banc is granted, the panel opinion is vacated. Without citing authority, the court assumes that only the last panel opinion in this case is vacated and only that panel's holding is before the en

banc court for review. While this may be the proper analysis for a matter of continuing concern in the district court like, for instance, a school desegregation case, such a course does not follow when we deal en banc with a case that has presented the same set of facts and the same issues and disputes in each of three appeals. We are dealing here with issues that were not satisfactorily resolved in the earlier appeals and which impact the present appeal.

The latest order involved in this en banc appeal is the *Robertson III* affirmance of $750,000 in compensatory damages and dual awards of punitive damages. The procedural history of this case is complex. In *Robertson I*, the panel remanded for a partial new trial. Phillips appealed from the retrial. This resulted in the *Robertson II* opinion in which the panel ordered a *Haslip* analysis of the $8,000,000 (dual $4,000,000) punitive award. When the case returned to this court after the *Haslip* review, as *Robertson III*, far more than a dispute over the *Haslip* analysis remained in the case. The dual awards issue clearly remains and this, of necessity, encompasses the retrial procedure through which the awards came about. This is shown by the suggestions for rehearing en banc from which our en banc consideration emerges. Phillips raised the following questions:

1. Whether a defendant may be subjected to two separate punitive damage awards in the same case based on two different theories of tort liability that are predicated on the same core act of the defendant and where the defendant's conduct has resulted in a single injury to the plaintiff and a single compensatory damage award.

2. Whether the Arkansas process by which punitive damages are imposed, assessed and reviewed is invalid under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution because that process permits juries to punish defendants based on their wealth and does not contain suffi-

---

**3.** *Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368 (8th Cir.1989); (*Robertson I* ); *Robertson Oil Co. v. Phillips Petroleum Co.*, 930 F.2d 1342 (8th Cir.1991) (*Robertson II* ); *Robertson*

*Oil Co. v. Phillips Petroleum Co.*, No. 91–3717, 1992 WL 333575, 1992 U.S.App. LEXIS 30,167 (8th Cir. Nov. 18, 1992) (vacated) (*Robertson III* ).

ciently definite or constitutionally meaningful standards.

3. Whether the excessive, duplicative and disproportionate nature of the two $4,000,000 punitive damage awards violated Phillips' constitutional due process rights.

4. Whether federal courts in diversity cases must apply federal, rather than state, excessiveness standards and are precluded by the Seventh Amendment from engaging in the kind of rigorous judicial review of punitive damage verdicts contemplated by *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 18–24, 111 S.Ct. 1032, 1044–46, 113 L.Ed.2d 1 (1991), and therefore must instead fashion particularly detailed and objective punitive damage jury instructions to comport with due process.

Petition for Rehearing and Suggestion for Rehearing En Banc (*Robertson III*) at ii–iii.

There can be little question that our grant of rehearing en banc must vacate those parts of all previous panel opinions which deal with the matters raised by Phillips in its suggestion for en banc review. That would include, at least, portions of the panel opinions in *Robertson II* and in *Robertson III*.

In any event, whatever was specifically vacated by our grant of en banc consideration, "sitting *en banc,* we may overrule any panel decision that a majority of the active judges believes [was] wrongly decided, unless a party would be seriously prejudiced as a result." *Van Gemert v. Boeing Co.,* 590 F.2d 433, 437 n. 9 (2d Cir.1978). The doctrine of law of the case is properly applied only to the district court and to other panels of the court of appeals. *Id.* It cannot be used to immunize a decision from review by the court en banc. *Id.; see also Watkins v. United States Army,* 875 F.2d 699, 704–05 n. 8 (9th Cir. 1989) (law of the case doctrine does not prevent the court which rehears a second appeal en banc from overruling the decision of the panel that decided the first appeal), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990); *Shimman v. International Union of Operating Eng'rs, Local 18,* 744 F.2d 1226, 1229 n. 3 (6th Cir.1984) (law of the case doctrine does not impair the power of an en banc court to overrule any panel

decision), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *Lincoln Nat'l Life Ins. Co. v. Roosth,* 306 F.2d 110, 114 (5th Cir.1962) (on a second appeal, the court en banc has the power to reexamine any prior panel decision), *cert. denied,* 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963).

Similarly, the en banc court has the power to overrule panel decisions in cases other than those before the court for en banc review. *See, e.g., United States v. Wise,* 976 F.2d 393, 401 (8th Cir.1992) (en banc) (overruling panel holdings in *United States v. Fortier,* 911 F.2d 100 (8th Cir.1990) and *United States v. Streeter,* 907 F.2d 781 (8th Cir.1990)); *United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc) ("insofar as our earlier [panel opinions] may be to the contrary, they should not be followed"), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). If this were not so, any prior panel decision would be locked in stone and could not be modified by an en banc court. I find no case in this or any other circuit that has adopted that position. Such a posture is particularly untenable in a case like this where we deal with one core of operative facts and one compensatory injury.

This circuit has not held to the contrary in circumstances comparable to these. In *Liddell v. Missouri,* 731 F.2d 1294 (8th Cir.) (en banc), *cert. denied sub. nom., Leggett v. Liddell,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), the St. Louis school desegregation case, this court invoked the law of the case doctrine in dealing with previously decided questions on interdistrict student transfers. *Liddell,* 731 F.2d at 1304. However, the principal prior decision on the transfers at issue, *Adams v. United States,* 620 F.2d 1277 (8th Cir.) (en banc), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980), was an en banc decision. *Liddell,* 731 F.2d at 1302. Even so, in *Liddell,* the author of the court's present opinion, who also authored the opinions in all three *Robertson* panel appeals, stated:

> The Court declares that we are bound by our previous holdings as to interdistrict transfers. The law of the case doctrine, however, applies with less force to prior decisions of a panel. *Van Gemert v. Boe-*

*ing Co.*, 590 F.2d 433, 436–37 n. 9 (2d Cir.1978); *aff'd*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478 at 796–97. Resting as it does on the precarious comparison with *Hills* [*v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792], even if the issue were firmly established by *Liddell V*, [*Liddell v. Bd. of Educ.*, 677 F.2d 626] the Court en banc should attempt to decide the case correctly rather than consistently. *See Robbins, et al. v. Prosser's Moving & Storage Co.*, 700 F.2d 433, 438 (8th Cir. 1983); *United States v. Unger*, 700 F.2d 445, 450 n. 10 (8th Cir.1983); *Wrist–Rocket Manufacturing Co. v. Saunders Archery Co.*, 578 F.2d 727, 730 (8th Cir.1978).[4]

*Liddell*, 731 F.2d at 1331 (Judge John R. Gibson, dissenting in part).

This statement reflects the correct policy to be followed in this and every other case. Outside of the context of a school desegregation (or similar) case in which the district court maintains continuing jurisdiction and day-to-day supervision over evolving adverse issues, Judge Gibson's statement in *Liddell* is (or should be) the law of this circuit. Sitting en banc, we should, indeed, attempt to decide a case "correctly rather than consistently."

**B. Earlier Denials of En Banc Review**

The fact that we denied en banc review of the panel opinions in *Robertson I* and *Robertson II* does not insulate them, if they were wrongly decided, from reversal now. The court's statement concerning en banc review reflects, as earlier indicated, immaterial acts insofar as this en banc proceeding is concerned. Denial of a petition for en banc review has no precedential value and does not establish law of the case. *Luckey v. Miller*, 929 F.2d 618, 622 (11th Cir.1991).

There are numerous reasons for voting to deny rehearing en banc other than agree-

ment with a panel opinion. This is especially true when, as in this matter, the case is being remanded for further activity in the district court. Federal Rule of Appellate Procedure 35 and Eighth Circuit Rule 35A disfavor and discourage en banc consideration and limit such occurrences to cases that present issues of grave constitutional dimension or exceptional public importance. Matters which come to the federal courts under diversity jurisdiction, as here, usually fit neither of these molds.

## II. DISCUSSION

I now turn to the matter of deciding the case correctly. This involves four points, only three of which ultimately affect the outcome of this litigation.

**A. Punitive Damages Instruction**

At the first trial, the district court instructed the jury as follows:

In addition to compensatory damages for any actual loss that Robertson Oil Company may have sustained, it asks for punitive damages from Phillips. Punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from Phillips, Robertson Oil Company has the burden of proving that Phillips *intentionally pursued a course of conduct for the purpose of causing damage*. You are not required to assess punitive damages against Phillips Petroleum Company, but you may do so if justified by the evidence.

Trial I Transcript, Vol. 5 at 82–83 (emphasis added).

At the retrial, the instruction stated:

In addition to compensatory damages for the actual loss that Robertson Oil sustained and has already recovered, it asks for punitive damages from Phillips for both

---

**4.** The case on which Judge John R. Gibson relied, *Van Gemert v. Boeing Co.*, 590 F.2d 433 (2d Cir.1978) (en banc), is procedurally similar to this case. After consideration by three panels (*Van Gemert I, Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.1975); *Van Gemert II, Van Gemert v. Boeing Co.*, 553 F.2d 812 (2d Cir.1977); and *Van Gemert III, Van Gemert v. Boeing Co.*,

573 F.2d 733 (2d Cir.1978)) the court reheard the case en banc. Boeing presented a "law of the case doctrine" argument premised on earlier panel decisions. The en banc court rejected the argument saying "sitting *en banc*, we may overrule any panel decision that a majority of the active judges believes was wrongly decided." *Van Gemert*, 590 F.2d at 437 n. 9.

intentional interference with contract and fraud. Punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from Phillips, Robertson Oil Company has the burden of proving that Phillips *intentionally pursued a course of conduct for the purpose of causing injury or damage.*

Trial II Transcript, Vol. 3 at 208 (emphasis added).

At the second trial, the district court further stated with reference to recovery of punitive damages:

> I instruct you that as to the claim of intentional interference with contract, Robertson Oil has met that burden. It is for you to decide whether Robertson Oil has met that burden as to the claim of fraud.

*Id.*

The general punitive damages instruction is patterned after the second of two alternative instructions set out in Arkansas Model Jury Instruction (AMI) 2217.[5] The first instruction, not used in this case, expressly requires a finding of malice.[6]

5. Arkansas Model Jury Instruction (AMI) 2217 states as follows:
 In addition to compensatory damages for any actual loss that _____ may have sustained, he asks for punitive damages from *[defendants]*. Punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from *[defendants]*, _____ has the burden of proving [either, first]:
 [That _____ knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally and probably result in (injury) (damage) and that he continued such conduct (with malice or) in reckless disregard of the consequences from which malice may be inferred]
 [Or, second]
 [That _____ intentionally pursued a course of conduct for the purpose of causing (injury) (damage)]
 [Or both].
 [In arriving at the amount of punitive damages you may consider the financial condition of _____, as shown by the evidence.]
 You are not required to assess punitive damages against _____ but you may do so if justified by the evidence.

6. Although the comment to the AMI instruction refers to use of the second instruction "in an

The language of the Robertson (AMI) instruction raises two somewhat related inquiries. The first question is whether evidence of an intentional tort, alone, is enough to permit submission of punitive damages to the jury. The second query is whether the "intentionally pursued ... conduct for the purpose of causing damage" language adequately guides the jury in finding the elements necessary for an award of punitive damages. I believe that use of the punitive damages instruction in this case is both contrary to Arkansas law and unconstitutional under the holdings of *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) and *TXO Prod. Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

### 1. Sufficiency Under Arkansas Law

There is no doubt that the district court regarded evidence of any intentional tort sufficient to submit the issue of punitive damages to the jury.[7] At the first trial the district court gave this instruction on intentional interference with a business expectancy:

intentional tort case," AMI 2217 Comment ¶ 1, cases cited in the comment merely hold that the then-existing AMI 2217 was to be used in a negligence case and was not to be used in an intentional tort matter. *See Ford Motor Credit Co. v. Herring,* 267 Ark. 201, 589 S.W.2d 584 (1979); *Tandy Corp. v. Bone,* 283 Ark. 399, 678 S.W.2d 312 (1984).

7. At the first trial, the district court initially stated, "I think the test [for punitive damages] under Arkansas law, which is presumably applicable here, requires willful and wanton behavior or repeated reckless acts from which malice can be inferred." Trial I Transcript, Vol. 5 at 7. The court then examined the AMI and concluded that the test "doesn't require malice or willful or wanton conduct. It requires that someone intentionally pursue a course of conduct with the purpose of causing injury. Willful and wanton and malice haven't got anything to do with the intentional tort according to this new [AMI] instruction." *Id.* at 8. Then, at the second trial, the district court states again, "if you have an intentional tort proved up, that that alone is sufficient to make a submissible case on punitive damages to the jury." Trial II Transcript, Vol. 2 at 238.

Interrogatory No. 4. Do you find from a preponderance of the evidence that Robertson Oil Company had a business relationship or expectancy with the Spe–Dee Mart stores; that Phillips Petroleum Company had knowledge of Robertson Oil's relationship or expectancy with the Spe–Dee Mart stores; that Phillips *intentionally and improperly interfered with that relationship;* and that Robertson Oil suffered damages which resulted from Phillips Petroleum's intentional and improper interference? You will answer that question "yes" or "no."

Trial I Transcript, Vol. 5 at 76. (Emphasis added). The jury at the first trial found that Phillips had committed this intentional tort. *Id.* at 143. The panel in *Robertson I* affirmed this finding but reversed the punitive damages award because it could not ascertain that the jury had used an intentional tort as the basis for such award. *Robertson I,* 871 F.2d at 1377. On retrial, the district court instructed the second jury, as indicated above, that the "claim of intentional interference with contract" found by the first jury meets the burden "of proving that Phillips intentionally pursued a course of conduct for the purpose of causing injury or damage." Trial II Transcript, Vol. 3 at 208. With this, the jury was effectively directed to consider only the amount of punitive damages arising from that intentional tort. Likewise, the second jury was told that a simple finding of fraud, another intentional tort, was sufficient for them to consider a second award of punitive damages. The punitive damages instruction contained no requirement of malice or recklessness or wantonness.[8] *Id.* This was error.

Arkansas law does not support use of a punitive damages instruction solely upon evidence of an intentional tort. In a case involving an action for breach of contract, the Arkansas Supreme Court stated that a bare showing of intentional misuse of insurance premium payments and an untrue representation that the insurance sought had been purchased would not justify punitive damages. *McClellan v. Brown,* 276 Ark. 28, 632 S.W.2d 406, 407 (1982) ("we must always consider circumstances other than the wrongdoer's intention to do what he did, in order to determine whether punitive damages are appropriate"). In *Viking Ins. Co. v. Jester,* 310 Ark. 317, 836 S.W.2d 371 (1992), an action for bad faith in settling an insurance claim, the Supreme Court of Arkansas approved a punitive damages instruction that required a finding that the defendant "engaged in affirmative misconduct which was dishonest, malicious, or oppressive." *Id.* 836 S.W.2d at 379. The approved instruction also states that "[a]ctual malice is that state of mind in which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, actual malice need not be proved but may be inferred from conduct and surrounding circumstances." *Id.* Thus, *Viking Insurance,* a post-*Haslip* decision, clearly undermines the validity of the punitive damages instruction given in this case.

The only Arkansas case that even arguably stands for the proposition that evidence of an intentional tort is sufficient, by itself, to support a jury inquiry on punitive damages is *Bruns v. Bruns,* 290 Ark. 347, 719 S.W.2d 691 (1986). In *Bruns,* a spousal battery case, the Supreme Court of Arkansas stated that "[p]unitive damages are recoverable when there is an intentional violation of another individual's rights." *Id.* 719 S.W.2d at 694. However, the Arkansas Supreme Court also expressly noted the existence of proof, as a matter of law, that Bruns was guilty of intent, willfulness, wantonness or conscious indifference from which malice could be inferred. *Id.* In its present opinion, the court relies heavily on *Ray Dodge, Inc. v. Moore,* 251 Ark. 1036, 479 S.W.2d 518 (1972). *Supra* at 377–78. However, that case also supports the proposition that malice is required for imposition of punitive damages in Arkansas. In *Ray Dodge,* the Arkansas Supreme Court

8. Arguably, the requirement of malice is contained in the statement "intentional pursuit of conduct for the purpose of causing harm", which is the definition of malice. *See* Black's Law Dictionary 862 (6th ed. 1990). The fallacy of that argument here is that no jury ever found that Phillips pursued the tortious conduct *for the purpose of causing harm.* The jury merely found that Phillips intentionally interfered with a contractual relationship and caused harm. Thus, the malice requirement has not been met.

stated, "[i]f, then, there was evidence tending to show that appellant intentionally performed a deliberate act with the intention of misleading a prospective purchaser about a material matter to his injury, it was proper to permit the jury to consider the award of exemplary or punitive damages." *Id.* 479 S.W.2d at 522. The Arkansas Supreme Court noted, however, that "there was sufficient evidence to support a finding of legal malice." *Id.* at 523.

In any event, it is clear from these Arkansas cases that evidence of or the bare finding of an intentional tort is not sufficient to trigger deliberations on punitive damages. Giving Robertson the benefit of every reasonable inference from the record, I find no evidence of malicious, oppressive, or outrageous conduct on the part of Phillips to support a punitive damages instruction in this case.[9] At the least, if the district court were to submit the issue of punitive damages to the jury, it should have been submitted with an instruction requiring a finding of malice in accord with Arkansas law.

### 2. Constitutionality

Assuming for the sake of argument that the instruction used in this case comports with Arkansas law, the instruction violates the Constitution. In *Haslip*, the defendant argued that the punitive damages instruction violated the due process clause because it failed to properly guide the jury. The Supreme Court "concede[d] that unlimited jury discretion ... in the fixing of punitive damages ˙ may invite extreme results that jar one's constitutional sensibilities." *Haslip*, 499 U.S. at 18, 111 S.Ct. at 1043. When a case is tried to a jury, adequate guidance from the court must be a factor in the consti-

tutional calculus. *Id.* Of course, this guidance must come from the instructions given by the trial judge.

The Supreme Court noted that among the factors "appropriate for the trial court's consideration [is] the culpability of the defendant's conduct." *Id.* at 20, 111 S.Ct. at 1044 (quotations omitted). The Supreme Court translated this factor into a requirement of specific restraint on jury discretion, requiring the jury to consider "the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct" before awarding punitive damages. *Id.* at 21, 111 S.Ct. at 1045. The district court's instruction that the jury must find merely that Phillips "intentionally pursued a course of conduct for the purpose of causing injury or damage," falls short of the requirements set forth in *Haslip*. By comparison, in reviewing the fraud findings in *Haslip*, the Supreme Court of Alabama found that "given [the] facts, the conclusion is inescapable that the fraud was intentional, gross, oppressive and malicious." *Pacific Mut. Life Ins. Co. v. Haslip*, 553 So.2d 537, 540 (Ala.1989) (quotation omitted).

Thus, after *Haslip*, it is clear that an adequate jury instruction must, at least, require a finding of malice or something reasonably akin to it.[10] The Robertson instruction did not and was unconstitutional.

### 3. Waiver

In spite of the above analysis, I find that Phillips' recent claims with regard to the wording of the instruction must fail. Phillips objected to the sufficiency of the evidence for

---

9. This dearth of evidence was not lost on the district court. At the first trial, at the close of plaintiff's case, the district court stated "I'm not inclined to think that there's been much of a case been made out for punitive damages." Trial I Transcript, Vol. 2 at 210.

10. A finding of actual or legal malice is required for imposition of punitive damages in all other states in the Eighth Circuit that allow punitive damages. *See Bismarck Realty Co. v. Folden*, 354 N.W.2d 636, 643 (N.D.1984) (a specific finding of actual or presumed oppression, fraud or malice and not merely intentional or willful conduct is

required; a finding of bad faith alone is not enough); *Case v. Murdock*, 488 N.W.2d 885, 891 (S.D.1992) (actual or presumed malice is required); *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 381 (Minn.1990) (willful, wanton and malicious conduct or willful indifference required); *Reed v. Chrysler Corp.*, 494 N.W.2d 224, 229 (Iowa 1992) (willful, wanton, actual or legal malice is required); *Burnett v. Griffith*, 769 S.W.2d 780, 787–89 (Mo.1989) (en banc) (outrageous conduct and culpable mental state or evil motive is required).

the submission of the issue of punitive damages to the jury. With this objection, I agree. However, I have fully examined the record and I find no specific objection by Phillips to the language of the instruction given by the trial court, either with respect to its failure to comport with Arkansas law or its constitutionality. While general constitutional claims were made at the conference on jury instructions, they fell short of raising the specific "guidance" issue raised in *Haslip* and discussed but not reached in *TXO*. I am convinced that a punitive damages instruction worded as set forth in the second instruction of AMI 2217 is unconstitutional. Its demise, however, must await another day when it can be considered under a properly raised objection.[11]

**B. Partial Remand**

My further explanation of the reasons for reversing the judgment for punitive damages begins with an examination of our previous decisions. The panel in *Robertson I* could not determine the exact basis for the jury's punitive damages award. *Robertson I,* 871 F.2d at 1377. Since some submitted theories could not support a punitive award, a retrial was ordered. *Id.* That part of the decision was clearly correct. It was incorrect, however, to order a retrial on less than all of the issues. That decision disregarded applicable law and was unfair to Phillips.

In its first appeal, Phillips vigorously argued for a retrial on all issues, relying on our decision in *Dudley v. Dittmer,* 795 F.2d 669 (8th Cir.1986). Phillips' Brief (*Robertson I*) at 42. *Dittmer* held that "when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand." *Id.* at 673. The *Robertson I* panel correctly concluded that *Dittmer* was applicable to the result of the first Robertson trial. *Robertson I,* 871 F.2d at 1375. The panel also correctly concluded that there was "only one basis for actual damages, the loss of the Spe–Dee Mart account." *Id.* at 1376. It then let the tortious interference with contract verdict stand and allowed the $750,000 compensatory award to escape reconsideration on retrial. *Id.* at 1377.

This may have been a proper result had the nature and amount of compensatory damages not been so inextricably intertwined with both a finding of punitive damages and the proper determination of their amount. Although a federal court sitting in diversity must apply the substantive law of the forum, the Federal Rules of Civil Procedure govern procedural matters. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Federal Rules permit partial retrials but only when the issues are distinct and separable. Fed.R.Civ.P. 59(a); *Gasoline Products Co. v. Champlin Ref. Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). In this circuit, the district court must consider the law of the forum state when deciding whether to grant only a partial retrial. *England v. Gulf & Western Mfg. Co.,* 728 F.2d 1026, 1029 (8th Cir.1984); *see also Sayre v. Musicland Group, Inc.,* 850 F.2d 350, 353 (8th Cir.1988) ("[r]eference to state law can be helpful"). Under Arkansas law, issues of punitive and compensatory damages are generally so interwoven that an error with respect to one requires a retrial of the whole case. *See Orsini v. Larry Moyer Trucking, Inc.,* 310 Ark. 179, 833 S.W.2d 366, 368 (1992); *City Nat'l Bank v. Goodwin,* 301 Ark. 182, 783 S.W.2d 335, 339 (1990); *KARK–TV v. Simon,* 280 Ark. 228, 656 S.W.2d 702, 705 (1983). The panel in *Robertson I* was rightly "troubled ... with the interplay between the considerations involved in compensatory and punitive damages." *Robertson I,* 871 F.2d at 1376. This concern was supported by the evidence and was sufficient to require a new trial on both issues.

As noted, since *Robertson I* was decided, the Supreme Court has issued two opinions on punitive damages. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *TXO Prod. Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). These cases underscore the *Robertson I* panel's concern. "[I]f punitive damages [are] to be awarded, the jury must take into consideration the character and the degree of the wrong as shown by the evidence and necessi-

11. Perhaps the *Viking Insurance* decision has now solved the problem in Arkansas.

ty of preventing similar wrong." *Haslip*, 499 U.S. at 19, 111 S.Ct. at 1044 (quotation omitted). Post-trial procedures validated by *Haslip* include consideration of the culpability of the defendant's conduct, the impact of the conduct upon the parties, and other factors such as the impact on third parties. *Id.* at 20–21, 111 S.Ct. at 1044–45. The Supreme Court also said that a required determination is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct, as well as an evaluation of the harm that actually occurred. *Id.* at 21, 111 S.Ct. at 1045. The Supreme Court's most recent pronouncement on punitive damages does not negate this proportionality requirement. *TXO*, —— U.S. at ——, 113 S.Ct. at 2721. Punitive or "exemplary damages allowed should bear some proportion to the real damage sustained." *Id.* The "[p]unitive damages should bear a reasonable relationship . . . to the harm that actually has occurred." *Id.* This determination of proportionality is necessary for there to be a definite and meaningful constraint on the discretion of the factfinder, in this case, the jury. *See Haslip*, 499 U.S. at 21, 111 S.Ct. at 1045.

Applying these rules, it is impossible to see how the second *Robertson* jury could have lawfully and fairly considered the issue of punitive damages without considering the nature of the compensatory damages and the evidence on which they were based. For instance, with regard to the punitive award rendered by the second jury for tortious interference with contract, the second jury was told only that an earlier jury had found that Phillips had not acted "in its own fair interest," that Robertson was damaged in the "amount of $750,000 and they [the second jury] should not question these findings." Trial II Transcript, Vol. 3 at 207. This approach was required by our opinion in *Robertson I* and it was error.

Robertson's only evidence of damages at the first trial was its diminished profits from the loss of the Spe–Dee Mart account.[12] At the second trial, absolutely no evidence was adduced on the nature and extent of compensatory damages. Thus, in deliberation, the jury had no information on compensatory matters except an instruction that an earlier jury, who heard several different witnesses on the issues of both liability and damages, had awarded $750,000.

This is not enough under either *Haslip* or Arkansas law. As the panel in *Robertson II* noted,

"[T]he nature, extent, and enormity of the wrong, the intent of the party committing it, and, generally, all the circumstances attending the particular transaction involved, including any mitigating circumstances which may operate to reduce without wholly defeating such damages, may be taken into consideration, and so, as a rule, may the financial and social condition and standing of the party."

*Robertson II*, 930 F.2d at 1346 (quoting *Holmes v. Hollingsworth*, 234 Ark. 347, 352 S.W.2d 96, 99 (1961)).

The second jury had no information on the nature of the lost profits or any of the circumstances attending the particular economic loss calculations. Likewise, Phillips was precluded at the second trial from offering any evidence on mitigation of economic loss. As a result, the punitive damages awards were the product of jury speculation based on an incomplete factual presentation.

## C. Lack of Underlying Compensatory Award

The most troublesome aspect of this case is the decision to affirm a $4,000,000 punitive damages award for fraud without an underlying award for compensatory (actual) damages arising from fraudulent conduct.[13] The law

---

**12.** Bruce Andrews, a certified public accountant from Little Rock, Arkansas, testified as an expert witness on the lost profits purportedly suffered by Robertson. Trial I Transcript, Vol. 2 at 43–91. Phillips responded with testimony from Richard H. Smith, a certified public accountant from Tulsa, Oklahoma, on the same subject. Trial I Transcript, Vol. 3 at 162–249.

**13.** An argument has been made that there are somehow mirroring compensatory awards for fraud and tortious interference or, at least, that the fraud award is subsumed within the tortious interference award, and there is, therefore, an underlying compensatory award for each punitive award. One of several weaknesses in this argument is that, even if there were evidence of

of Arkansas is crystal clear: "punitive damages are not recoverable unless compensatory damages not only have been suffered by the plaintiff but also have been assessed by the jury." *Lake v. Lake*, 262 Ark. 852, 562 S.W.2d 68, 69 (1978). There has been no valid determination by either the first or second jury that Robertson suffered compensable damages resulting from fraud. Thus, at least, the punitive award based upon fraud should be set aside.

On retrial after *Robertson I*, the plaintiff chose to proceed on only one theory of recovery, fraud.[14] Of course, under our panel decision in *Robertson I*, plaintiff had already prevailed on the tortious interference theory and had obtained an award of compensatory damages. Thus, according to *Robertson I*, the only issue with regard to the tortious interference theory, as earlier discussed, was punitive damages.[15] Because we said in *Rob-*

*ertson I* that "[e]ach of these theories ... would support a different amount of punitive damages, depending upon the conduct involved," *Robertson I*, 871 F.2d at 1376, the district court submitted the case to the jury on three separate interrogatories, one dealing with liability for fraud and two dealing with punitive damages, one for each liability theory. As also noted, no inquiry was made at the second trial with regard to compensatory damages for either theory. If all roads do not now lead to Rome for punitive damages purposes, and we are really dealing with two discrete intentional torts, each separate punitive award must also be supported by a separate compensatory award.[16]

Robertson contends that two different fact patterns support the jury's distinct findings of tortious interference with contract and fraud.[17] Robertson's fraud claim was prem-

damage caused by the fraud, it is impossible for a reviewing court to ascertain what portion of the damages to attribute to the fraud for purposes of a proportionality review as mandated by both *Haslip* and *TXO*. *See* discussion, *supra* at 392–93.

14. Robertson abandoned its claim for negligence at the beginning of the trial. Trial II Transcript, Vol. 1 at· 5.

15. A proper analysis of the facts shows that we were wrong in *Robertson I* and we directed the district court toward a faulty approach in the second trial.

16. In its now-vacated opinion, the panel stated that Phillips "got what it asked for" in the retrial, since it had requested separate damage instructions in the first trial. *Robertson III*, 1992 WL 333575 at **10, 1992 U.S.App. LEXIS 30,167 at **33. Such is not the case. Phillips initially asked for separate damage interrogatories on the compensatory damage claims, not the punitive claim. Trial I Transcript, Vol. 5 at 44. The approach was rejected by the district court. *Id.* After the liability determinations were made, Robertson asked for and received a jury instruction requiring *one* compensatory award. *Id.* at 147. Robertson's adoption of the bifurcation of damage awards approach comes on the scene, apparently as a result of our statement in *Robertson I* that "all intentional torts which support[ed] the punitive damage award [of $5,000,000], each involve[d] different conduct." *Robertson I*, 871 F.2d at 1376. Thus, with respect, it is Robertson, not Phillips, that has changed position as the litigation has progressed on the proper approach to awarding damages.

Also, in its present opinion, the court states, "Phillips, however, never argued that there was not an award of compensatory damages underlying the award of punitive damages for fraud" after its second or third appeal to this court. *Supra* at 382. Again, with respect, this is incorrect. In its opening brief in the third appeal (leading to the panel opinion designated *Robertson III*), Phillips argued extensively and accurately that the two separate $4,000,000 awards imposed "duplicate punishments for the same injury." Phillips' Brief (*Robertson III*) at 35–37. Additionally, the first question raised in Phillips' suggestions for this en banc review encompasses this issue. Thus, the court has had ample notice of this obvious problem of duplication of damages.

17. I note that the court's opinion, *supra* at 383, states that "Phillips argued against the single punitive damage award returned in the first trial." The opinion then contends that "[i]n a sense ... Phillips got what it asked for [duplicative punitive awards] in the second trial." *Supra* at 384. This statement requires, in my view, a substantial misinterpretation of Phillips' reply brief in *Robertson I*. Phillips argued, correctly, that the district court separately submitted several theories of liability (conduct proving some theories would support punitive damages and conduct proving other theories would not), but submitted only a "general or global" inquiry on punitive damages without in any way limiting the jury's use of all the evidence. Phillips' Reply Brief (*Robertson I*) at 3. Indeed, Phillips accurately pointed out that the jury was permitted to assess punitive damages on every action from May through October for conduct supporting all causes of action (including some that do not support punitive damages) and was permitted to

ised on misrepresentations or assurances made by Phillips during the spring and summer of 1984 that Phillips would "brand" all retail outlets of Robertson's client, Spe–Dee Mart, with the "Phillips 66" logo. Any alleged acts that factually support this claim ended, by Robertson's own account, when he was informed, on the night before the October 24, 1984, meeting, that Phillips would not brand all the Spe–Dee Mart stores.[18] The essence of the tortious interference claim was that Phillips said or implied nasty things about Butch Robertson to the owners of Spe–Dee Mart at that meeting and, as a result, Spe–Dee Mart severed its connections with Robertson. No one challenges the assumption that the only compensable damage in the case arises from Robertson's loss of the Spe–Dee Mart account. Indeed, evidence as to the value of lost profits because of Robertson's loss of the Spe–Dee Mart account was the only actual damage evidence ever submitted by Robertson.

Under Arkansas law, the elements of a fraud claim are 1) a false representation of a material fact; 2) knowledge or belief on the part of the person making the representation that the representation is false; 3) an intent to induce the other party to act or refrain from acting in reliance on the misrepresentation; 4) a justifiable reliance by the other party; and 5) resulting damages. *Interstate Freeway Serv., Inc. v. Houser*, 310 Ark. 302, 835 S.W.2d 872, 873–74 (1992). An essential element of a fraud claim is proof of damages proximately caused by the misrepresentation. *Ozark Kenworth, Inc. v. Neidecker*, 283 Ark. 196, 672 S.W.2d 899, 904–05 (1984). With no proof of causal connection between the misrepresentation and the injury, a claim must fail. *Id.*

There is no proof of causal connection between the misrepresentation and the injury in this case.[19] The fraud did not cause the loss of the Spe–Dee Mart account—the nasty things said or implied about Butch Robertson at the October meeting caused, according to Robertson, the loss of the account.

The evidence is absolutely clear that Robertson connected the loss of the Spe–Dee Mart account to the October meeting. He testified that the "deal that we had [to brand Spe–Dee Mart] was ... blown by the comments that were made at the [October] meeting with the Greenwoods that morning in their office." Trial II Transcript, Vol. 2 at 113. Stanley Greenwood stated that as a result of the meeting "I told my father we had a problem, that I perceived that Butch was history with Phillips." *Id.* at 182. Greenwood also stated that he perceived

consider proof of a theory based upon a duty of good faith and fair dealing which was set aside by the district court after trial. *Id.* at 4. The jury instruction on this improper theory, according to Phillips' brief, required findings involving standards of decency, fairness, reasonableness, good faith and honesty. Thus, as noted by Phillips' brief, "the jury was permitted to consider breaches of duty defined in the strongest terms (decency, honesty, fairness, and good faith) in arriving at the punitive damages award, when those breaches of duty did not exist as a matter of law." This was the context in which the argument in the reply brief now cited by the court's opinion was made. And, Phillips was correct, some of the conduct may have been proper to consider for punitive damages purposes and some was clearly not. Transformation of this argument into a request by Phillips for consideration of duplicative punitive awards by the jury, is, in my view, a clearly incorrect reading of the Phillips' brief.

18. Robertson testified that Phillips had promised in April or May of 1984 that it would brand all the Spe–Dee Mart stores. Trial II Transcript,

Vol. 1 at 267–270. He further stated that the promise was renewed at various times later in the summer prior to the October meeting. He was told the night before the meeting that the branding was not going to happen. There was evidence that Spe–Dee Mart was cleaning up its stores during the fall of 1984 in preparation for an "inspection," which could indicate that Robertson conveyed some message to Spe–Dee Mart about branding. Trial II Transcript, Vol. 2 at 174. There was no evidence that Spe–Dee Mart was told by either Robertson or Phillips that Phillips had promised to brand all outlets.

19. This is not to say that Phillips' decision not to brand Spe–Dee Mart played no part in Spe–Dee Mart's termination of its relationship with Robertson. The decision not to brand was the subject of a separate cause of action for breach of contract on which the jury could not reach a verdict. Trial I Transcript, Vol. 5 at 74–75. The district court declared a mistrial on that claim. *Id.* at 165. The fact that Phillips, for five months, misrepresented its position on the decision not to brand did not cause the Greenwoods to sever their business relationship with Robertson.

some problem with Robertson's finances before the October meeting. *Id.* at 197–98. This perception and the discussions at the October meeting, according to Greenwood, caused him to speed up his search for a jobbership. *Id.* at 211. The Spe–Dee account was lost as a result of Greenwood's perception, developed prior to the October meeting, that Robertson had financial problems, coupled with the further perception gained at the October meeting that Robertson "was history" with Phillips. Phillips' purported promises to Robertson that it would brand all Spe–Dee Mart stores could not, by themselves, be the legal cause of the loss.[20]

The proper measure of damages on the fraud claim, under Arkansas law, is Robertson's out of pocket loss.[21] *See, e.g., Interstate Freeway,* 835 S.W.2d at 875. Evidence which might have supported Robertson's damages for fraud could have included a showing that he expended sums in anticipation of the eventual branding or that the value of some service or asset promised by Phillips was less than represented by Phillips. There is no such evidence.

Robertson did testify that because of the false representations by Phillips, he did not seek an alternative supplier who would be willing to brand Spe–Dee Mart. Trial II Transcript, Vol. 1 at 279. There was, however, no further evidence that Spe–Dee Mart, in such event, would have been willing to accept a substitute for Phillips or that Robertson could have found another satisfactory supplier. To the contrary, the evidence was that Spe–Dee Mart had been looking for its own jobbership and that it otherwise desired branding only with Phillips because of credit card volume at one Phillips outlet that Spe–Dee Mart had purchased. Trial II Transcript, Vol. 2 at 174–75. Neither was there evidence that this reliance scenario proximately caused any of Robertson's damages. There was no evidence that Robertson would have conducted himself any differently toward Spe–Dee Mart had the alleged misrepresentations made by Phillips in the spring or summer of 1984 not been made. In short, proof of causation connecting the purported misrepresentations and the lost profits from the Spe–Dee Mart account is absent.

Further, the jury in this case was not given any instruction on the measure of damages for fraud, which is different than the measure of damages arising from tortious interference.[22] Jurors were told only the elements of fraud and the definition of proximate cause. A special interrogatory asked whether the actions of Phillips were the proximate cause of damage to Robertson, but the jury was never told how to measure such damages. The district court instructed the jury that Robertson had been damaged in the amount of $750,000 and that:

> [t]his amount, this $750,000, has already been awarded to Robertson Oil Company

---

**20.** Phillips had no duty to brand Spe–Dee Mart or any other entity. I concede, however, that if Spe–Dee Mart knew of the promises made to Robertson at the time of the October meeting, this could have been a factor in the formation of its conclusion that Robertson "was history" with Phillips. But this was part and parcel of the tortious interference, not evidence of damages flowing proximately from the fraud.

**21.** Two measures of damages are generally applied in Arkansas actions for fraud. *Interstate Freeway,* 835 S.W.2d at 875. The first measure is the benefit of the bargain measure, in which the injured party is entitled to the difference between the value of the property, business, or chattel as represented and its actual value at the time of purchase. *Id.* In essence, the injured party would receive his expectation. *Id.* The second measure is the out-of pocket measure, in which the injured party is to be made whole by being restored to the position he was in prior to the injury. *Id.* The first has no application to the circumstances of this case. *Cf. Central Microfilm Serv. Corp. v. Basic/Four Corp.,* 688 F.2d 1206, 1220–21 (8th Cir.1982) (benefit of bargain measure makes no sense in a case not involving representations as to specific values), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983); *Kerr v. First Commodity Corp.,* 735 F.2d 281, 285 (8th Cir.1984) (benefit of bargain rule is inadequate in some circumstances including when nothing of value is received in the transaction).

**22.** The proper measure of damages for tortious interference is the present value of profits lost as a result of the improper actions. Restatement (Second) of Torts, § 774A(1)(a) and (b) (1979). *See, e.g., H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1549 (8th Cir.1989) (applying Minnesota law). The measure of damages for fraud is either "out-of-pocket" or "benefit of the bargain." *See supra* n. 21.

for its compensatory damages. You should not, therefore, make any award to compensate Robertson Oil Company *for its loss of the Spe–Dee Mart account* on either the allegation of fraud or the allegation of intentional interference with contract.

Trial II Transcript, Vol. 3 at 207–08 (Emphasis added). This instruction effectively directed a verdict on the issue of causation and the measure of damages for fraud. This was error. The law and the evidence do not support such an instruction or such a finding. The acts of fraud should properly have been viewed as nonactionable "bad acts;" as evidence which is, of course, relevant to the issue of the motive or intent or state of mind of Phillips on the tortious interference claim, but which cannot and did not stand alone as a separate cause of action for fraud.

The problems in this case are illustrated by comparison to another Eighth Circuit case that correctly approved a dual award of punitive damages. In *Glass Design Imports, Inc. v. Import Specialties,* 867 F.2d 1139 (8th Cir.1989), we approved separate punitive awards for tortious interference and fraud. Examination of that case shows that each award was supported by a distinct and separable compensatory award and by distinct and separable culpable conduct by the defendant which caused palpable injury to plaintiff.

In that case, Glass Design, an importer, asserted claims of fraud and tortious interference with a business relationship against, among others, Rastal GmbH & Co. KG, a German corporation that manufactured specialty glass and Gene Lepere, Rastal's American agent. The parties agreed that Glass Design would be Rastal's sole American importer and retailer except for some preexisting customers serviced by Lepere. Further, Rastal and Lepere represented that Rastal's products were made in West Germany by Rastal. Glass Design soon became aware that it was not the sole Rastal distributor in the United States and that much of the glass was not made by Rastal or anyone else in West Germany.

In a separate incident, a customer (Cribbins) sought to purchase 200 beer steins which Glass Design did not have in stock. This prompted Glass Design to contact Lepere who informed Glass Design that he also had none. Later, Lepere himself sold the steins to the customer without paying a commission to Glass Design who had arranged the sale.

The district court entered judgments for Glass Design. We affirmed both punitive awards because Lepere's actions in the Cribbins deal constituted conduct "separate and apart from the fraudulent misrepresentations made to the principals of Glass Design," and because both compensatory awards could independently support punitive damages.[23] *Id.* at 1144–45.

Obviously, the interference with the Cribbins' expectancy, which occurred months after the date of the fraudulent misrepresentations on exclusivity and origin, was a separate act that gave rise to both separate compensatory damages and a separate punitive award. In contrast, in this case, the acts of fraud gave rise to no separate damages and thus can only be viewed as part of a continuing pattern of conduct leading to the eventual tortious interference and not as a separate actionable tort. Thus, at best for Robertson, *Glass Design* could only support the $4,000,000 punitive fraud award if the underlying facts had represented a separate, discrete event leading to separate, calculable compensatory damages. Such is not the case here. The punishment, if any were proper, should have been meted out for the conduct leading to the single compensatory award.[24]

---

23. In contrast to the present case, the compensatory award for fraud in *Glass Design* was supported by concrete evidence of losses incurred in reliance on the misrepresentations (including lost profits on direct sales, loan losses, initial capital investment and legal and professional fees). *Glass Design,* 867 F.2d at 1141.

24. Again, as noted *supra* at 392–93 and 393–94 n. 13, even if some portion of the $750,000

compensatory award could be attributed to the fraud claim, the jury could not have considered the nature, character and amount of the compensatory award in the second trial as required by both *Haslip* and Arkansas law for the award of punitive damages. How did the district court, in its *Haslip* review of punitive damages ordered by this court, determine what part of the $750,000 to apportion to the tortious interference theory and which part was awarded for fraud? Of

## D. Duplicative Awards

Even if the dual punitive awards had been supported by valid compensatory awards, the punitive awards are nevertheless duplicative. In *Holmberg v. Morrisette*, we stated that "[f]raud and conversion are separate legal theories of liability, but in reality defendants have injured Holmberg only once. Accordingly, *they are to be punished only once, not as many times as there are separate legal theories that have been found to fit the case.*" *Holmberg v. Morrisette*, 800 F.2d 205, 212 (8th Cir.1986) (emphasis added).[25]

Strangely, in this case we have two separate juries deciding liability issues, one jury hearing the evidence on and deciding the amount of compensatory damages and the other jury deciding punitive damages. The district court was correct at the first trial to submit the case, if it was submissible at all, for one determination of punitive damages arising from the entire core of facts leading to the single compensatory award. As noted in *Holmberg*, the number of legal theories of liability arising from one core of facts does not change the legal analysis on punitive damages.

Recognizing that this court en banc is entitled to overrule *Holmberg*, I have searched the reporters for cases affirming dual awards of punitive damages arising out of one core of facts, even one as wide ranging and repetitious as in *Holmberg*.[26] I found none.[27] On the other hand, there are numerous cases both in and out of this circuit which require a nonduplicative result when exemplary and punitive damages are found under a single core of facts giving rise to compensatory damages. *See, e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir.1992) (requiring election of either statutory treble damages for anti-trust violations or common law punitive damages for tort claims), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1284 (8th Cir.1981) (treble damages for anti-trust count and punitive damages for state law count would be duplicative); *Lexton–Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 822 (Colo.1992) (treble damages and punitive damages awarded under misappropriation claim and deceptive trade practices claim were duplicative and both were not recoverable); *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987) (awards of treble damages for deceptive trade practices and punitive damages under common law claim amount to prohibited double recovery); *Stoner v. Houston*, 265 Ark. 928, 582 S.W.2d 28, 31 (1979) (treble damages allowed under statute for damage to timber were punitive and prohibited as duplicative of punitive damages awarded for trespass).

Finally, to summarize Parts C and D, because they are somewhat interwoven, I note that if the acts supporting the fraud claim and the tortious interference claim necessarily intertwine and overlap in order to establish elements of a claim represented by Robertson's lost profits, *Holmberg* and every other case I have found dictate a single punitive award. If, on the other hand, the acts un-

course there is no way for this to have been done fairly. It should not have been done this way at all.

**25.** Much has been said recently in this circuit about the "law of the case" doctrine. In this regard, it should be noted that the panel opinion in *Robertson III* is clearly contrary to the ruling in *Holmberg*.

**26.** *Holmberg* involved a series of business transactions involving Mintex, a Minnesota corporation; Morrisette, a shareholder of Mintex; RJC Enterprises, a business partly owned by Morrisette; Trans World Services, Inc., a Minnesota corporation; Holmberg, an individual supplying a letter of credit; and G.N.A. Hamzer & Co., a Nigerian importer. The business activity at issue extended over a period exceeding one year. The pleadings alleged two counts of fraud and conversion based upon multiple acts of submitting and supporting false documents in an effort to draw down a letter of credit.

**27.** There is a Florida case in which a dual award was affirmed, *See Palm Beach Atlantic College, Inc. v. First United Fund, Ltd.*, 928 F.2d 1538, 1546 (11th Cir.1991). However that case is inapposite for the reason that Florida law does not require an underlying award of compensatory damages for imposition of punitive damages. I believe that *Haslip* now places this proposition of law in doubt.

derlying each tort, separately support the elements of a claim flowing from each separate tort, then Arkansas law and the law of every other jurisdiction except, perhaps, Florida, preclude a punitive award for the fraud claim without a separate and distinct compensatory award based on fraud.

This represents the rule of law in effect in virtually every jurisdiction. It is also the only fair approach to the issue. Accordingly, the $4,000,000 punitive damages award for fraud returned by the second jury was error and should be set aside.

### III. CONCLUSION

As noted earlier, at the end of Robertson's case in the first trial, Phillips made a motion for a directed verdict on Robertson's claim for punitive damages. The district court stated, in response, "I'm not inclined to think that there's been much of a case been made out for punitive damages, but I want to think about it some more." Trial I Transcript, Vol. 2 at 210. The court was correct. The record does not disclose much of a case for punitive damages.

At the end of Robertson's case in the second trial, Phillips made a motion to dismiss Robertson's fraud claim. The district court stated, "Well, I'm going to deny the motion, but it is a thinner case than the last one." Trial II Transcript, Vol. 2 at 231. This statement at the second trial must be considered in light of the fact that the first jury could not reach a verdict on whether Phillips promised Robertson that it would "brand all the Spe–Dee Mart Stores." Jury Instruction Interrogatory No. 1, Trial I Transcript, Vol. 5 at 75; Return of Verdict, *Id.* at 142. This was the purported promise, vigorously denied by Phillips, that Robertson claimed Phillips did not intend to keep when made in May of 1984 and at various other times during that summer. Thus, if the second trial evidence on fraud was thinner than the evidence at the first trial, the Robertson fraud theory must represent one of the thinnest fraud cases in the history of Arkansas

law ever to support a substantial award of punitive damages.

Accordingly, I would reverse and remand for a new trial, or, in the alternative, reverse and dismiss the $4,000,000 punitive award based upon the intentional tort of fraud.